IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38765-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BRANDY J. HOOD, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — The State brought eight charges against Brandy Hood for assaulting and harassing her teenage daughter throughout several days in January 2020. The jury convicted Ms. Hood of seven of the charges.

Ms. Hood appeals four of her convictions on double jeopardy grounds. She also argues the trial court erred by not treating two other convictions as the same criminal conduct for sentencing purposes. The State cross appeals and argues the trial court erred in treating three convictions as the same criminal conduct for sentencing purposes. We disagree with Ms. Hood's arguments and agree with the State's. We reverse in part, remand for resentencing, and direct the trial court to correct two other sentencing errors.

No. 38765-8-III
*State v. Hood*

FACTS

*Report of abuse*

On January 16, 2020, a Thursday, Reardan Police Chief Andrew Manke began investigating reports that Ms. Hood was physically abusing her teenage daughter, A.S.[1] A.S.'s seven-year-old sister, S.H., disclosed to school officials that their mother was physically assaulting her sister. A.S. had not been attending school that week.

On January 17, Chief Manke went to check on A.S. at her home. As he approached, Ms. Hood came out of the house, and he asked to speak with A.S. He told Ms. Hood there had been a report of an altercation between her and A.S., and he wanted to check on A.S. Ms. Hood denied there had been any problems. She said A.S. was not home, that she would return after the weekend, and declined Chief Manke's request to come inside the house.

Chief Manke returned on Monday, January 20, a school holiday, to speak with A.S. A.S. denied any abuse. Ms. Hood indicated A.S. would be back in school the next morning. Chief Manke intended to speak with A.S. alone at school the next day, but she

[1] We use initials to protect the children's privacy. Gen. Order 2012-1 of Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc. genorders_orddisp&ordnumber=2012_001&div=III.

arrived late with Ms. Hood, who requested paperwork to transfer A.S. out of the school district.

On January 21, Chief Manke returned to Ms. Hood's home with a Child Protective Services investigator and arrested Ms. Hood. A.S. admitted the reports of Ms. Hood abusing her were true.

*Charges*

The State charged Ms. Hood with eight counts occurring on or about specific dates and alleged the "family or household member" aggravator for each count. *See* RCW 10.99.020. The counts, paraphrased for brevity, were:

Count 1: January 12, 2020, second degree assault (with scissors);

Count 2: January 10, 2020, harassment, threat to kill;

Count 3: January 11, 2020, fourth degree assault (punching face);

Count 4: January 10, 2020, second degree assault (strangulation);

Count 5: January 10, 2020, fourth degree assault (pulling hair);

Count 6: January 10, 2020, fourth degree assault (punching eye);

Count 7: January 16, 2020, fourth degree assault (holding butter knife below eye);

Count 8: January 20, 2020, fourth degree assault (punching eye).

*See* Clerk's Papers (CP) at 32-34.

*Trial*

Two years after her arrest, Ms. Hood proceeded to a jury trial. A.S. testified that she and her mother had a "toxic" relationship. 1 Rep. of Proc. (RP) (Jan. 12, 2022) at 190. A.S. recalled emotional abuse all her life, which became progressively more physical after her younger brother moved out. S.H. described the relationship between her sister and their mother as "bad and disappointing." 1 RP (Jan. 13, 2022) at 311.

A.S. recalled, before January 2020, her mother slapping her hard enough that her nose would bleed, but throughout approximately one week in mid-January 2020, the physical abuse suddenly escalated.

A.S. recalled that "[r]eally early on it would be like her punching me in the face, pulling my hair. Just—just pushing aggressively." 1 RP (Jan. 12, 2022) at 192. S.H. recalled: "My mom would yell at my sister every single day and would hit her . . . like kick her against the wall. . . . And then every single day it got worse and worse and worse." 1 RP (Jan. 13, 2022) at 312. The punching and hairpulling continued through the week. A.S.'s bruising was so severe that her mother kept her home from school for that week.

A.S. described her mother lashing out at "elevated moments." 1 RP (Jan. 13, 2022) at 408. When her mother was "at a 10," something minor would set her off and she

4

would assault A.S. 1 RP (Jan. 12, 2022) at 198. A.S. described minor things such as, "maybe the dishes weren't put away correctly or just I didn't do [S.H.]'s hair right one time." 1 RP (Jan. 12, 2022) at 196. Her mother blamed her for her brother moving out. To A.S., it seemed like her mother was taking all her sadness and anger out on A.S. A.S. described the abuse as constant:

> It would just be like from the morning like from the moment you wake up to like—to like 1:00 or 2:00 a.m. It would just be constantly. I—I didn't really eat. It was just so like fighting all the time. I couldn't get a break. . . . Every day [I] was questioning whether it's gonna stop or [if] I'm just not gonna be around anymore. . . . I thought I was gonna die."

1 RP (Jan. 12, 2022) at 210-11. S.H. could not remember how close together the incidents happened, other than the fact that her sister would get yelled at every day. She was "pretty sure that they were just separate." 1 RP (Jan. 13, 2022) at 319.

A.S. described her mother pulling her hair "all the time." 1 RP (Jan. 12, 2022) at 193. There was no exact reason or time, and it would happen "every day." 1 RP (Jan. 12, 2022) at 193. A.S. recalled: "[S]he would drag me into different rooms of the house with my hair, mainly in the front and just like drag me down and forward and like walk me into a room." 1 RP (Jan. 12, 2022) at 194. Her mother would rip her hair out of her head and it was thinning in the front.

A.S. recalled multiple instances of her mother putting her hands around A.S.'s neck and squeezing. It ranged from her mother just grabbing A.S. to her mother trying to strangle her. One time, A.S. was on the ground and her mother used both hands to push her down, and A.S. had difficulty breathing and started seeing black. Her mother would let up pressure and slap A.S. on the face and then return to pushing A.S. down. Other times, A.S.'s mother would push her up against the wall with one hand and push her neck. Once her mother pushed her down while she was walking up the stairs and held A.S. still with one hand and pushed against her neck with the other.

S.H. recalled her sister being strangled on the stairs, describing an incident where their mother grabbed A.S. by the hair, throwing her onto the stairs, and choking her. She recalled their mother using one hand to choke her sister.

A.S. recalled a "scissors incident" early in the week. 1 RP (Jan. 12, 2022) at 192. Something minor set her mother off while she was near her mother's craft area, and her mother pinned her against the window and stabbed her in the upper chest with the pointed end of a closed pair of scissors. She stabbed A.S. at least five times and broke the skin, causing her to bleed. A.S. still had a scar from the scissors at the time of trial. While stabbing A.S., her mother said, "I could kill you right now." 1 RP (Jan. 12, 2022) at 200. A.S. was terrified and did not know if she was going to live.

S.H. also recalled the incident, testifying that their mother had once put scissors to her sister's neck and said she would kill her. Because things had been getting worse every day, S.H. thought it was possible their mother would actually kill her sister.

S.H. recalled seeing her sister with a bloody nose and saw her skin turn red when their mother pushed her. S.H. saw her sister with a bloody nose multiple times. One time, she came downstairs and saw her sister in the bathroom with a bloody nose and their mother in the dining room smoking marijuana. She recalled another time when their mother, while in the kitchen, slapped her sister and caused her nose to bleed.

A.S. recalled multiple instances of her mother punching her, mainly on her face. Ms. Hood would also sometimes punch her arms and grab her. In one incident in the kitchen, her mother grabbed a butter knife and dragged it against her body, scraping her skin.

S.H. recalled their mother punching her sister in the eye so that she got a black eye. S.H. recalled seeing her mother punch A.S. in the eye once while in the dining room: "[M]y mom was yelling and then my sister was like up against the wall. And then my mom like punched her really hard in the eye and then it started like turning red. And then like a day after that, it like turned like yellow and purple." 1 RP (Jan. 13, 2022) at 342. S.H. remembered it happening before Chief Manke came to the house because, when he

arrived, her sister had to cover the bruising with makeup. The second time Chief Manke came, her sister did not have the black eye anymore. S.H. could not remember if her sister had a black eye more than once.

When Chief Manke first came to their house on January 17, the girls' mother hid A.S. in a closet. She made them clean up the house so it would look nice when he returned, during which time the abuse "mellowed out." 1 RP (Jan. 12, 2022) at 205. The girls' mother told A.S. what to say when Chief Manke came on January 20 and directed A.S. to wear long sleeves and makeup to cover the bruises. She also helped A.S. style her hair so that the thinning areas were less noticeable. Chief Manke recalled that A.S. appeared made up and was wearing a long sleeve shirt buttoned to her neck.

After Chief Manke left on January 20, Ms. Hood became mad that A.S. was not convincing enough. She pinned A.S. against the wall and punched her in the face, giving A.S. a black eye. Ms. Hood punched A.S. more than once in the face, but A.S. could not count how many times.

Teresa Forshag, a nurse practitioner specializing in child abuse, examined A.S. on January 22 and documented her injuries, photographs of which were introduced into evidence. She testified that A.S. came in with "a lot of bruising," including a "pretty significant" bruised left eye, bruising on her right temple and under her chin, bruising

across her chest, "extensive, heavy bruising on her arms," and bruising on her back. 1 RP at (Jan. 12, 2022) at 273. She was missing "a fair amount of hair," had broken blood vessels in her eye, and abrasions on her tongue and knee. 1 RP (Jan. 12, 2022) at 273.

A.S. told Nurse Forshag her mother had punched her in the eye on two occasions the previous week. The bruising on her arms occurred when her mother grabbed her and threw her into some furniture. She was missing hair because her mother had pulled her by her hair. She had bitten her tongue when her mother hit her under her chin. Her knee was scraped when her mother dragged her across the floor. Nurse Forshag was concerned that the broken blood vessels in A.S.'s eye were due to an airway obstruction that restricted her breathing, and A.S. disclosed her mother had choked her at least once over the last two weeks to the point she started losing consciousness.

Ms. Hood testified in her own defense. She denied stabbing A.S. with scissors, threatening to kill her, punching her in the face or eye, strangling her, or holding a butter knife to her throat. She denied pulling A.S. by the hair and blamed A.S.'s hair loss on eczema. She admitted she once slapped A.S. during an argument because she thought her daughter was about to headbutt her. She attributed A.S.'s injuries to a fall off a stepladder.

9

In closing argument, the State acknowledged the uncertainty as to the dates of each offense but emphasized that it had charged the crimes as "on or about" various dates in mid-January. 2 RP (Jan. 14, 2022) at 735.

The State argued counts 1 and 2, second degree assault with a deadly weapon and harassment, threat to kill, had been proved by the testimony about Ms. Hood's assault of A.S. with the scissors and threat to kill her. Count 4, second degree assault by strangulation, had been proved by testimony that Ms. Hood had put her hands around A.S.'s throat and caused her to have difficulty breathing.

As to the five counts of fourth degree assault, the State argued count 3 had been proved by the testimony about Ms. Hood punching A.S. in the face and the evidence from Nurse Forshag that A.S. had a bruise on her right temple. Count 5 had been proved by the testimony about Ms. Hood pulling A.S.'s hair and the evidence showing the bald patches on A.S.'s scalp. Count 6 had been proved by the testimony about the first time Ms. Hood punched A.S. in the eye. Count 7 had been proved by the testimony that Ms. Hood had held a butter knife against A.S.'s skin. Count 8 had been proved by the testimony about the second time Ms. Hood punched A.S. in the eye.

The jury found Ms. Hood guilty of all counts except count 7, the fourth degree assault with the butter knife. It also returned a special verdict finding that Ms. Hood and A.S. were members of the same family or household.

*Sentencing*

Ms. Hood argued that counts 2, 4, 5, and 6 were all the same criminal conduct for sentencing purposes, as were counts 1 and 3. She therefore calculated her offender score as a 4.

The trial court calculated Ms. Hood's offender score as 6 on counts 1, 2, and 4, the felony convictions. As part of its calculation, the court treated counts 4, 5, and 6—assault by strangulation, hair pulling, and punching A.S. in the eye—as the same criminal conduct because they all took place on the same day. It noted that acts did not have to be committed simultaneously to be treated as occurring at the same time. The State voiced its disagreement, arguing that "if there are time breaks in between the assaults, then they can't be at the same time." 2 RP (Feb. 22, 2022) at 819. It argued that the testimony at trial showed "that all of the assaults were separate acts. . . . [T]he Defendant formed a new intent." 2 RP (Feb. 22, 2022) at 820. The court interrupted, stating it agreed that the assaults were separate acts, "[b]ut they all took place the same day and the same

timeframe. And I think they're close enough to be treated as same criminal conduct."

2 RP (Feb. 22, 2022) at 820.

The State requested that the court order an evaluation for substance use disorder because there was testimony Ms. Hood was smoking marijuana in front of her children. It also requested that the court impose the $100 domestic violence penalty assessment. The court stated it would only impose mandatory legal financial obligations and agreed with the State that the domestic violence penalty assessment was mandatory.

The court sentenced Ms. Hood to a standard range sentence of 43 months of imprisonment followed by 18 months of community custody. It ordered Ms. Hood to undergo an evaluation for substance use disorder and to pay the $100 domestic violence penalty assessment.

Ms. Hood appealed and the State cross appealed.

ANALYSIS

DOUBLE JEOPARDY

Ms. Hood contends her fourth degree assault convictions—counts 3, 5, 6, and 8—violate principles of double jeopardy. We disagree.

The prohibition on double jeopardy includes protection against being punished twice for the same offense. *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 980, 329 P.3d

78 (2014). When a person has multiple convictions under the same statutory provision,

whether they are punished twice for the same offense depends on what the legislature has

defined as the punishable act or unit of prosecution. *Id.* at 980-81. For assault, the unit of

prosecution is the course of conduct of assault rather than each assaultive act. *Id.* at 984.

To determine whether multiple assaultive acts constitute a single course of

conduct, we look at:

- The length of time over which the assaultive acts took place,
- Whether the assaultive acts took place in the same location,
- The defendant's intent or motivation for the different assaultive acts,
- Whether the acts were uninterrupted or whether there were any intervening acts or events, and
- Whether there was an opportunity for the defendant to reconsider his or her actions.

*Id.* at 985. These factors are useful, but no one factor is dispositive. *Id.* Instead of

mechanically balancing the factors, a reviewing court ultimately looks at the totality of

the circumstances. *Id.*

We disagree that double jeopardy prevents Ms. Hood from being punished

separately for the two convictions for punching A.S. in the eye, count 6 and count 8. The

testimony at trial showed that there were two distinct incidents in which Ms. Hood

punched A.S. in the eye. S.H. described A.S. being punched in the eye and covering up

13

the marks on her face with makeup before Chief Manke arrived on January 20. A.S.

testified that her mother also punched her in the eye after Chief Manke visited that day.

A.S. described her mother assaulting her after small things would set her off; we

can therefore infer that there were intervening periods of calm when she had time to

reconsider her actions. There was no testimony indicating the punches to the eye were

connected to the second degree assault and harassment involving the scissors or the

second degree assault by strangulation. Based on the totality of the circumstances, the

facts support that each incident of Ms. Hood punching A.S. in the eye was a separate

course of conduct from the felony assaults of which Ms. Hood was convicted.

We also disagree that double jeopardy prevents Ms. Hood from being separately

punished for the two convictions for pulling A.S.'s hair and punching A.S., counts 3

and 5. A.S. testified that her mother pulled her hair and hit her constantly every day for

one week. Just because A.S. could not describe each and every attack throughout the

week does not require these separate attacks to be sentenced as if they occurred together

or as if they occurred during the felony assaults A.S. described. Reviewing the totality of

the circumstances, as we must, it is obvious that the hairpulling and punching attacks

started and stopped not just throughout one day, but throughout each and every day for

14

one week.  By allowing counts 3 and 5 to be punished separately, we are confident that Ms. Hood is not being punished twice for any other attack.

SAME CRIMINAL CONDUCT

For the first time on appeal, Ms. Hood argues the trial court erred by not treating count 1 (assault with a deadly weapon) and count 2 (harassment, threat to kill), as the same criminal conduct for sentencing purposes.  As explained below, Ms. Hood waived her challenge to this claim of error.

While a defendant cannot generally waive a challenge to a miscalculated offender score, "waiver can be found where the alleged error involves an agreement to facts, later disputed, or where the alleged error involves a matter of trial court discretion."  *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 874, 50 P.3d 618 (2002).  Whether multiple offenses are the same criminal conduct is a matter of trial court discretion.  *State v. Graciano*, 176 Wn.2d 531, 537, 295 P.3d 219 (2013).  We cannot evaluate whether the trial court abused its discretion when it was never given the opportunity to exercise it.  We thus conclude Ms. Hood waived this challenge to her offender score and decline to review Ms. Hood's claim that count 1 and count 2 constituted the same criminal conduct.

In its cross appeal, the State argues the trial court erred in treating the three counts charged as occurring on or about January 10, 2020, as the same criminal conduct for sentencing purposes. We agree.

Whether two offenses constitute the same criminal conduct for sentencing is a different inquiry than whether the offenses violate double jeopardy. *State v. French*, 157 Wn.2d 593, 611, 141 P.3d 54 (2006). Two crimes constitute the "same criminal conduct" if they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). The defendant has the burden of proving two crimes are the same criminal conduct, and we review the sentencing court's decision on the matter for an abuse of discretion or a misapplication of the law. *Graciano*, 176 Wn.2d at 537-38.

The trial court considered count 4, count 5, and count 6, assault by strangulation, hairpulling, and the first punch to the eye, respectively, as the same criminal conduct because they occurred on the same day. The trial court relied on the fact that the information charged all three assaults as occurring "on or about January 10, 2020." CP at 33-34. But the evidence at trial failed to establish specific dates for any of the charges except count 8, the second punch to the eye that occurred on January 20 after Chief Manke interviewed A.S. The testimony at trial made no temporal connection

16

between Ms. Hood strangling A.S. (count 4), pulling A.S.'s hair (count 5), and the first time Ms. Hood punched A.S. in the eye (count 6). Because the trial court's finding that the crimes occurred at the same time and place is unsupported by the record, it erred in treating these counts as the same criminal conduct.

OTHER SENTENCING ERRORS

Ms. Hood raises two additional sentencing errors; the State concedes both. We accept the State's concessions.

Ms. Hood first argues that the court erred in imposing the domestic violence penalty assessment because she is indigent. The State concedes the assessment should be struck, but disagrees it has anything to do with Ms. Hood's indigency. We agree with the State.

A domestic violence assessment is a penalty that a court may impose regardless of a defendant's indigent status and without consideration of the defendant's ability to pay. RCW 10.99.080(5); *State v. Smith*, 9 Wn. App. 2d 122, 127, 442 P.3d 265 (2019). It is discretionary, however, and not mandatory as the State argued during sentencing. Because the trial court clearly expressed its intent to impose only mandatory legal financial obligations, we agree with the parties that the assessment should be struck.

Ms. Hood next argues the trial court lacked authority to order a substance use evaluation and treatment. The State concedes the court lacked authority. We agree.

Under RCW 9.94A.703(3)(c), the trial court may order a defendant to engage in substance use treatment if the substance use was crime related. S.H.'s passing reference at trial to her mother smoking marijuana does not show that her mother's assaultive behavior was related to her marijuana use. A trial court may order participation in rehabilitative programs, including chemical dependency evaluation or treatment, when the court finds a defendant has a chemical dependency that contributed to the offense. RCW 9.94A.607(1). The trial court made no such finding here nor would the record support such a finding. We conclude that the trial court lacked statutory authority to order Ms. Hood to submit to substance use evaluation and treatment as a community custody condition.

No. 38765-8-III
*State v. Hood*

Reversed in part and remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_Lawrence-Berrey, J._
Lawrence-Berrey, J.

WE CONCUR:

_Fearing, J._
Fearing, C.J.

_Staab, J._
Staab, J.

19